UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

In re:

GREAT LAKES COMNET, INC., *et al.*,[1]

Debtors.

_____/

PETER KRAVITZ, LIQUIDATION TRUSTEE,

Plaintiff,

v.

JOHN SUMMERSETT, PAUL BOWMAN, RYAN THELEN, ANDRE COOKS, RANDY FLETCHER, JANET BEILFUSS, SIDNEY SHANK, TODD ROESLER, DUANE BRONSON, DAVID LAROCCA, LES JENKINS, GEORGE ORPHAN, DAVID SCHROEDER, JOHN LODDEN, MICHIGAN NETWORK SERVICES, LOCAL EXCHANGE CARRIERS OF MICHIGAN INC., IBDC TELECOM CORPORATION, NULEEF COMMUNICATIONS LLC, and JOHN DOES,

Defendants.

_____/

Case No. GL 16-00290-jtg
(Jointly Administered)

Chapter 11

Hon. John T. Gregg

Adv. Proc. No. 17-80180-jtg

**OPINION REGARDING MOTION TO DISMISS
PURSUANT TO FED. R. BANKR. P. 7012 FILED BY
<u>LOCAL EXCHANGE CARRIERS OF MICHIGAN, INC.</u>**

APPEARANCES: Stuart A. Gold, Esq., GOLD LANGE & MAJOROS PC, Southfield, Michigan, Roger P. Meyers, Esq., Jessica V. Currie, Esq., and Vincent C. Sallan, Esq., BUSH SEYFERTH & PAIGE PLLC, Troy, Michigan for Local Exchange Carriers of Michigan, Inc.; Michael C. Hammer, Esq. and Doron Yitzchaki, Esq., DICKINSON WRIGHT PLLC, Ann Arbor, Michigan, Jonathan Bach, Esq., David Bright, Esq., Max Schlan, Esq., Seth Van Aalten, Esq. and Cathy Hershcopf, Esq., COOLEY LLP, New York, New York for Peter Kravitz, Trustee of the GLC Liquidation Trust

---

[1]     The Debtors are Great Lakes Comnet, Inc. (Case No. 16-00290) and Comlink, L.L.C. (Case No. 16-00292-jtg).

This matter comes before the court on a motion to dismiss and brief in support thereof [Adv. Dkt. No. 36] (the "Motion") filed by Local Exchange Carriers of Michigan, Inc., one of the defendants in the above-captioned adversary proceeding ("LEC-MI").[2]  LEC-MI argues that the Complaint fails to state claims upon which relief can be granted under Fed. R. Bankr. P. 7012 (incorporating Fed. R. Civ. P. 12(b)(6)) for concert of action, conspiracy, unjust enrichment, aiding and abetting breach of fiduciary duty, and the avoidance and recovery of fraudulent transfers, both actual and constructive.[3]   Peter Kravitz, the Liquidation Trustee of the GLC Liquidation Trust and the plaintiff in the above-captioned adversary proceeding (the "Trustee"), filed a response [Adv. Dkt. No. 57] (the "Response") in which he disputes all but one of LEC-MI's arguments. For the following reasons, the Motion is granted in part, and denied in part.

## JURISDICTION

The federal district courts have "original and exclusive jurisdiction" over all cases under the Bankruptcy Code, but may refer bankruptcy cases to the bankruptcy courts.  28 U.S.C. § 157(a); 28 U.S.C. § 1334(a).[4] Upon referral, bankruptcy courts are authorized to hear, determine, and enter appropriate orders and judgments in core proceedings "arising under" the Bankruptcy Code, or "arising in" a case under the Bankruptcy Code.  28 U.S.C. § 157(b)(1).[5]  Proceedings "arising under" the Bankruptcy Code are proceedings that involve claims created or determined

---

[2]    Citations to "[Dkt. No. __]" are to entries on the docket in the underlying bankruptcy case, while citations to "[Adv. Dkt. No. __]" are to entries on the docket in this adversary proceeding.

[3]    The Bankruptcy Code is set forth in 11 U.S.C. §§ 101 *et seq*.  Specific sections of the Bankruptcy Code are identified as "section ___."  The Federal Rules of Civil Procedure are set forth in Fed. R. Civ. P. 1 *et seq*. and are identified as "Rule ___."  The Federal Rules of Bankruptcy Procedure are set forth in Fed. R. Bankr. P. 1001 *et seq*. and are identified as "Bankruptcy Rule ___."

[4]    The United States District Court for the Western District of Michigan has made such a reference.  LCivR 83.2(a).

[5]    Bankruptcy courts are required to initially determine whether a particular proceeding is a core proceeding. *Sanders Confectionery Prods., Inc. v. Heller Fin., Inc.*, 973 F.2d 474, 483 (6th Cir. 1992).

by a statutory provision of the Bankruptcy Code.  *Mich. Emp't Sec. Comm'n v. Wolverine Radio Co., Inc. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1144 (6th Cir. 1991) (citation omitted). Proceedings "arising in" a case under the Bankruptcy Code are proceedings that could only arise in a bankruptcy case and would have no existence outside of a bankruptcy case.  *Id.* (citation omitted).

In this adversary proceeding, the Trustee's claims for the avoidance and recovery of fraudulent transfers arise under the Bankruptcy Code and are therefore core.   28 U.S.C. § 157(b)(2)(H).   The Trustee's remaining claims against LEC-MI do not arise under the Bankruptcy Code or in a case under the Bankruptcy Code.  Rather, the claims against LEC-MI for concert of action, conspiracy, unjust enrichment and aiding and abetting breach of fiduciary duty all arise under Michigan law.  None of these claims comprise a proceeding that can arise solely in the context of a bankruptcy case, because they may be pursued without the prerequisite of a bankruptcy filing.  As such, these claims are not part of a core proceeding.

Nonetheless, this court may exercise jurisdiction if the proceeding is "non-core, but related to" the bankruptcy.  28 U.S.C. § 157(c)(1); *In re Wolverine Radio Co.*, 930 F.2d at 1142 (quoting *Pacor, Inc. v. Higgins (In re Pacor)*, 743 F.2d 984, 994 (3d Cir. 1984)).  Because the claims against LEC-MI that arise under Michigan law could form the basis for increased payments to creditors under the confirmed plan of liquidation, this proceeding is non-core, but related to the bankruptcy. *See*, *e.g.*, *Morris v. Zelch (In re Reg'l Diagnostics, LLC)*, 372 B.R. 3, 22-25 (Bankr. N.D. Ohio 2007) (related to jurisdiction because potential recovery from state law claims would augment creditor recovery); *see also Browning v. Levy*, 283 F.3d 761, 773 (6th Cir. 2002) (related to

jurisdiction because potential recovery from legal malpractice claim would represent asset available for distribution to creditors).[6]

## **BACKGROUND**[7]

Great Lakes Comnet, Inc. (the "Debtor", and together with Comlink, L.L.C., the "Debtors")[8] was a Michigan corporation that owned and operated a 6,500-mile fiber-optic network that connected long-distance calls of national exchange carriers such as AT&T, Verizon, Sprint and Qwest with local exchange carriers.  (Compl. ¶¶ 21-22)  The Debtor's network provided telecommunications services to commercial and residential customers in Michigan, Ohio, Wisconsin, Illinois and Minnesota.  (Compl. ¶ 21)

### A.   *Officers' Schemes*

Beginning in 2010, the Debtor's officers perpetrated four schemes designed to charge national exchange carriers with illegal tariffs, thereby artificially inflating the Debtor's profits. (Compl. ¶ 33)   First, as part of their "traffic pumping scheme," the officers caused the Debtor to enter revenue sharing agreements with certain local exchange carriers and "traffic aggregators," including LEC-MI.  (Compl. ¶¶ 34-37)  The revenue sharing agreement between the Debtor and LEC-MI required LEC-MI to route call traffic onto the Debtor's network in violation of certain rules and regulations promulgated by the Federal Communications Commission (the "FCC"). (Compl. ¶¶ 37-39, 49-50)  In order to facilitate the scheme, LEC-MI created a new transport

---

[6]     The order entered in connection with this Opinion is not a final judgment or order.  The court's authority in that regard is therefore not at issue.  The court notes, however, that the Trustee has consented in paragraph 5 of the Complaint to entry of a final judgment or order by this court.  *See* 28 U.S.C. § 157(c)(1)-(2); *Wellness Int'l Network, Ltd. v. Sharif*, ___ U.S. ___, 135 S. Ct. 1932, 1949 (2015).

[7]     For purposes of the Motion, the court accepts as true the following factual allegations in the Complaint.

[8]     The Complaint is somewhat inconsistent.  It alleges facts in the background section that relate only to the Debtor.  In the counts for state law claims, the Complaint refers to the Debtors.  Because the background section largely omits Comlink, L.L.C., the court assumes that the state law claims only relate to the Debtor.

facility known as "Trunk Group 331" that allowed it to deliver 1-800 number traffic onto the Debtor's network. (Compl. ¶ 39) In return, the Debtor paid approximately $2.4 million to LEC-MI between January 2012 and May 2016. (Compl. ¶ 40)

As part of the traffic pumping scheme, the Debtor also paid other third parties in exchange for their agreements to route traffic onto LEC-MI's switch in Southfield, Michigan. (Compl. ¶¶ 43-47) From there, LEC-MI routed traffic to Trunk Group 331 and subsequently delivered it onto the Debtor's network. (Compl. ¶¶ 44, 46) As a result of the traffic pumping scheme, the Debtor benefited from an extraordinary increase in call traffic between 2010 and 2014. (Compl. ¶ 48)

The traffic pumping scheme had another adverse consequence. The Debtor was required to file updated tariffs according to FCC rules and regulations. (Compl. ¶ 50) Despite this requirement, the Debtor's chief operating officer intentionally filed erroneous tariffs with the FCC so as not to reveal the scheme he and the other officers had implemented. (Compl. ¶ 50) By intentionally filing incorrect tariffs, the Debtor's chief operating officer further contributed to the traffic pumping scheme. (Compl. ¶ 50)

Second, as part of their "mileage pumping scheme," the officers caused the Debtor to use a circuitous, inefficient route for directing calls. (Compl. ¶ 54) Rather than route calls from its switch in Southfield, Michigan to AT&T's switch in Bloomfield Township, Michigan, a distance of only seven miles, LEC-MI routed calls to the Debtor's switch in Westphalia, Michigan. (Compl. ¶¶ 56-57) By adding seventy-six miles of transport in violation of FCC rules and regulations, the Debtor was able to charge its national exchange carriers for traffic routed over unnecessary distances. (Compl. ¶¶ 59-60)

5

Third, as part of the "inflated tariff rates scheme," the officers caused the Debtor to charge approximately 30 times that of the closest local exchange carrier in violation of FCC rules and regulations.  (Compl. ¶ 62)  Similarly, the Debtor's officers caused the Debtor to charge a tandem switching rate of nearly 50 times that of the closest local exchange carrier.  (Compl. ¶ 64)  In order to charge these rates, the officers caused the Debtor to represent in FCC filings that it was a rural carrier, when in reality it was not.  (Compl. ¶ 65)

Finally, as part of the "fraudulent rates scheme," the officers caused the Debtor to charge fraudulent tariffs for services it never provided.  (Compl. ¶ 68)  Instead of billing national exchange carriers by applying LEC-MI's operating company code, the Debtor billed the carriers for 83 miles of transport by using the wrong code in violation of FCC rules and regulations.[9]  (Compl. ¶¶ 68-70)

## B.      *Debtor's Disputes with Carriers and Officers' Misrepresentations*

In 2012, AT&T and other national exchange carriers began to suspect that the Debtor was engaged in improper conduct and started to withhold payments.  (Compl. ¶ 71)  The Debtor's officers, however, concealed the reasons for the withheld payments by advising the Debtor's board of directors that the Debtor was experiencing billing disputes with the carriers.  (Compl. ¶¶ 72-73) According to the officers, the billing disputes amounted to nothing more than matters of collection. (Compl. ¶ 73)   Although communications detailing the schemes were sent by the national exchange carriers, the officers intentionally concealed the communications from the board. (Compl. ¶ 74)

In late February 2014 and with the schemes continuing, certain national exchange carriers filed an informal complaint with the FCC against the Debtor and LEC-MI.  (Compl. ¶ 75)  At a

---

[9]      The Complaint does not appear to allege that LEC-MI participated in the fraudulent rates scheme.

meeting of the Debtor's board a few weeks later, the officers did not apprise the board of the true facts surrounding the disputes.  (Compl. ¶ 75)  Instead, the officers advised the board that the billing disputes presented an opportunity to "bring negotiations to a head" and characterized the Debtor as the victim.  (Compl. ¶¶ 75-76)

In April 2014, a second informal complaint was filed by AT&T.  (Compl. ¶ 79)  The board was informed of the complaint in late April 2014 but, again, the officers did not disclose the basis for the complaint.  (Compl. ¶ 79)  Instead, the officers continued to misrepresent the nature of the disputes to the board.  (Compl. ¶ 76)  Thereafter, the officers caused the Debtor to take countermeasures by, among other things, filing a complaint against AT&T with the Michigan Public Service Commission.  (Compl. ¶ 76)  In its complaint, the Debtor claimed that it had no control over how LEC-MI routed call traffic.  (Compl. ¶ 76)

Around the same time, the officers informed the board that the Debtor was experiencing cash flow difficulties and that the Debtor would soon need access to additional funds.  (Compl. ¶ 79)  The officers again concealed the real reasons for the Debtor's financial difficulties.  (Compl. ¶ 79)  Instead of informing the board that the Debtor needed funds as a result of their schemes, the officers told the board that the funds were necessary for "continued growth."  (Compl. ¶ 79)

The Debtor's financial condition continued to deteriorate over the next two years.  (Compl. ¶¶ 80, 93, 96-97)  In October 2014, AT&T filed a formal complaint with the FCC alleging that the Debtor was involved in an unlawful tariff scheme.  (Compl. ¶¶ 81-82)  The formal complaint described in detail the traffic pumping, mileage pumping, inflated rates and fraudulent rates schemes.  (Compl. ¶ 82)

In March 2015, the FCC found in favor of AT&T when it concluded that the Debtor had violated various FCC rules and regulations.  (Compl. ¶¶ 84-88)  In addition to awarding AT&T

7

significant damages, the FCC required the Debtor to reduce its tariffs, which ultimately rendered the Debtor insolvent.  (Compl. ¶¶ 92-94, 96)

## C.    *Debtors' Bankruptcy Cases*

On January 25, 2016, the Debtors filed voluntary petitions for relief under chapter 11.  After the Debtors sold substantially all of their assets, the court confirmed the Debtors' plan of liquidation on March 27, 2017 [Dkt. No. 37].  Pursuant to the plan, the GLC Liquidation Trust was created.  The Trustee is vested with authority to pursue causes of action, including those set forth in the Complaint, on behalf of the GLC Liquidation Trust.

The Trustee commenced this adversary proceeding by filing his Complaint against LEC-MI and seventeen other defendants on November 10, 2017 (the "Complaint").  The Complaint is comprised of fifteen counts, seven of which assert claims against LEC-MI.  LEC-MI seeks dismissal of the following counts of the Complaint:

- Count VI – Concert of Action

- Count VII – Conspiracy

- Count X – Unjust Enrichment

- Count VIII– Aiding and Abetting Breach of Fiduciary Duty (Officers)

- Count IX – Aiding and Abetting Breach of Fiduciary Duty (Directors)[10]

- Count XI – Fraudulent Transfers under 11 U.S.C. § 544(b)

- Count XII – Fraudulent Transfers under 11 U.S.C. § 548

After the matter was fully briefed, the court held a hearing and took the matter under advisement.

---

[10]    LEC-MI moved to dismiss Count IX of the Complaint, which alleges that LEC-MI aided and abetted the directors' breach of fiduciary duty.  In his Response, the Trustee concedes that Count IX should be dismissed.

## STANDARD

Rule 12 of the Federal Rules of Civil Procedure provides, in pertinent part, that a party may seek dismissal of a complaint for the "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, the complaint "must contain either direct or inferential allegations with respect to all material elements necessary to sustain a recovery under some viable legal theory." *Bickerstaff v. Lucarelli*, 830 F.3d 388, 396 (6th Cir. 2016) (quotation omitted). In determining a motion to dismiss under Rule 12(b)(6), a court must accept all factual allegations as true and construe all inferences from those allegations in favor of the plaintiff. *Gavitt v. Born*, 835 F.3d 623, 639-40 (6th Cir. 2016) (citation omitted).

A court must determine whether a complaint contains sufficient factual allegations to state "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *United States ex rel. Harper v. Muskingum Watershed Conservancy Dist.*, 842 F.3d 430, 435 (6th Cir. 2016). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). The plausibility standard is not akin to a "probability requirement," but instead requires more than a "sheer possibility" that the defendant has committed the misconduct. *Id.* The plausibility standard requires a plaintiff to plead sufficient facts to raise a "reasonable expectation" that discovery will reveal evidence of the misconduct alleged. *Solo v. United Parcel Serv. Co.*, 819 F.3d 788, 793-94 (6th Cir. 2016) (citing *Twombly*, 550 U.S. at 556). Conclusory legal allegations that lack the specific facts necessary to establish a cause of action will not suffice. *New Albany Tractor, Inc. v. Louisville Tractor, Inc.*, 650 F.3d 1046, 1050 (6th Cir. 2011).

9

## ISSUES

The court is called upon to address the following issues in connection with the Motion:

(i)     whether Michigan's wrongful conduct rule forecloses the Trustee's claims for concert of action, conspiracy, unjust enrichment, aiding and abetting breach of fiduciary duty;

(ii)    whether the complaint sufficiently pleads causation with respect to claims under Michigan law for concert of action, conspiracy, unjust enrichment, aiding and abetting breach of fiduciary duty;

(iii)   whether the Trustee's claims for concert of action, conspiracy, aiding and abetting breach of fiduciary duty, and unjust enrichment are time barred by the applicable statutes of limitation under Michigan law;

(iv)    whether the Trustee has plausibly stated a claim for unjust enrichment under Michigan law; and

(v)     whether the Trustee is required to plead his claims for the avoidance of actual and constructive fraudulent transfers under sections 544 and 548 with particularity pursuant to Rule 9(b) while separating those claims into separate counts.

## DISCUSSION

According to LEC-MI, the wrongful conduct rule bars the Trustee from proceeding with his claims for concert of action, conspiracy, unjust enrichment, and aiding and abetting breach of fiduciary duty in Counts VI, VII, VIII, IX and X.  LEC-MI further contends that those same counts should be dismissed because the Complaint fails to sufficiently plead causation, a *prima facie* element of the claims.  LEC-MI also argues that those same claims are time barred by the applicable statutes of limitation under Michigan law, and that the revenue sharing agreement between the Debtor and LEC-MI precludes the Trustee's claim for unjust enrichment under Count X.  Finally, LEC-MI argues that Counts XI and XII should be dismissed because, among other things, the Trustee has failed to plead his actual and constructive fraudulent transfer claims under sections 544 and 548 with particularity.

*A.        Wrongful Conduct Rule Under Michigan Law*

LEC-MI contends that the wrongful conduct rule forecloses the Trustee's claims for concert of action, conspiracy, unjust enrichment, and aiding and abetting breach of fiduciary duty. According to LEC-MI, because the claims are premised on the underlying illegal schemes perpetrated by the Debtor's officers, the Debtor was equally at fault and thus not entitled to seek recovery under Michigan law.

The Trustee does not deny that his state law claims could generally be subject to the wrongful conduct rule. Instead, the Trustee argues that the wrongful conduct rule is inapplicable at this stage of the litigation given the specific facts alleged in the Complaint.

State law determines whether the wrongful conduct rule applies. *Hagan v. Baird (In re B&P Baird Holdings, Inc.)*, 591 Fed. Appx. 434, 441 (6th Cir. 2015); *see also Terlecky v. Hurd (In re Dublin Sec., Inc.)*, 133 F.3d 377, 380 (6th Cir. 1997) (applying doctrine of *in pari delicto* under Ohio law). In Michigan, the wrongful conduct rule generally refers to two maxims founded in the common law. *Orzel v. Scott Drug Co.*, 449 Mich. 550, 558-59; 537 N.W.2d 208 (Mich. 1995). First, a plaintiff's claim is barred "[w]hen a plaintiff's action is based, in whole or in part, on his own illegal conduct." *Id*. at 558. Second, the doctrine of *in pari delicto* bars a plaintiff's claim "when a plaintiff's action is based on his own illegal conduct and the defendant has participated equally in the illegal activity." *Id*.[11]

In order for a defendant successfully assert the wrongful conduct rule, a "plaintiff's conduct must be prohibited or almost entirely prohibited under a penal or criminal statute." *Id*. at 561.[12]

---

[11]      The doctrine of *in pari delicto* is considered a subset of the wrongful conduct rule, and is not a separate standalone doctrine in Michigan. *See Midwest Mem'l Grp. LLC v. Citigroup Glob. Mkts., Inc.*, 2015 WL 5519398, at *9 (Mich. Ct. App. Sept. 17, 2015).

[12]      It is unnecessary for an alleged offender to have been found guilty of, pled to, or even charged with, a crime as prerequisite to application of the wrongful conduct rule. *See, e.g.*, *Stopera v. DiMarco*, 218 Mich. App. 565, 569; 554 N.W.2d 379 (Mich. Ct. App. 1996) (applying wrongful conduct rule despite lack of criminal charges for adultery).

In addition, "a sufficient causal nexus must exist between the plaintiff's illegal conduct and the plaintiff's asserted damages." *Id*. at 564.

The wrongful conduct rule is applied so that courts do not aid a plaintiff who bases a claim on his own illegal activity. *See, e.g.*, *MCA Fin. Corp. v. Grant Thornton, L.L.P.*, 263 Mich. App. 152, 156-57; 687 N.W.2d 850 (Mich. Ct. App. 2004). The Michigan Supreme Court has explained that the wrongful conduct rule upholds the following policy concerns:

> First, by making relief potentially available for wrongdoers, courts in effect would condone and encourage illegal conduct. . . Second, some wrongdoers would be able to receive a profit or compensation as a result of their illegal acts. Third, and related to the two previously mentioned results, the public would view the legal system as a mockery of justice. Fourth, and finally, wrongdoers would be able to shift much of the responsibility for their illegal acts to other parties.

*Orzel*, 449 Mich. at 559-60 (internal citations omitted).[13]

Because the wrongful conduct rule is an affirmative defense, it does not rebut a plaintiff's *prima facie* case. Rather, it attempts to foreclose a plaintiff from proceeding with his claims. *Scalici v. Bank One, N.A.*, 2005 WL 2291732, at *2 (Mich. Ct. App. Sept. 20, 2005) (citing *Campbell v. St. John Hosp.*, 434 Mich. 608, 615-16; 455 N.W.2d 695 (Mich. 1990)). A defendant has the burden of establishing that the rule applies. The defendant can do so on a motion to dismiss, however, if the defense is apparent on the face of the complaint. *Kohut v. Metzler Locricchio Serra & Co., P.C. (In re MuniVest Servs., LLC)*, 500 B.R. 487, 500 (Bankr. E.D. Mich. 2013); *Scalici*, 2005 WL 2291732, at *2.

The parties devote significant attention to whether the parties' conduct is prohibited or is almost entirely prohibited under a penal or criminal statute. Without much elaboration, LEC-MI argues that the conduct alleged in the Complaint violates Michigan criminal statutes for bribery,

---

[13] These policy considerations should not be confused with the two requirements for the wrongful conduct rule to apply. *See MCA Fin. Corp.*, 263 Mich. App. at 159.

gross fraud or cheat at common law, racketeering, and use of false pretenses with intent to defraud. *See* Mich. Comp. Laws §§ 750.118, 750.280, 750.159g and 750.218. Alternatively, LEC-MI contends that even illegal civil conduct can, under the right circumstances, support application of the wrongful conduct rule. LEC-MI also highlights that the Complaint uses the terms "fraud", "scheme", "unlawful", and "kickback" more than 100 times. In his response, the Trustee emphasizes that the wrongful conduct alleged in the Complaint is based on the Debtor's violation of FCC rules and regulations, not any penal or criminal statute of any significance.

As a threshold matter, LEC-MI must do more than conclusively state in its Motion that the conduct could be subject to the wrongful conduct rule. Because the wrongful conduct rule is an affirmative defense, LEC-MI must make more than a passing reference to penal or criminal statutes. LEC-MI must point to specific provisions in the Complaint alleging conduct that could inferentially constitute a violation of a penal or criminal statute. For the most part, LEC-MI has not explained how the Complaint demonstrates or even allows the court to infer the occurrence of the aforementioned crimes. The court shall address LEC-MI's limited arguments against the backdrop of the specific allegations in the Complaint.

 1.      *Bribery – Mich. Comp. Laws § 750.118*

Under Michigan law, the offense of bribery criminalizes the corrupt accepting of gifts or gratuities by government officers or the promising by government officers to undertake official acts in exchange for a benefit. Mich. Comp. Laws § 750.118. If guilty, the government officer is charged with a felony punishable by fine or imprisonment. *Id.* The statute defines a government officer as an "executive, legislative, or judicial officer." *Id.*

It is difficult to understand how the officers' wrongful conduct constitutes bribery under Michigan law. The Complaint contains no allegation that one or more of the officers were

13

"government officers."  It also does not allege that the officers attempted to bribe a "government officer."  Michigan's bribery statute is therefore not applicable to the wrongful conduct alleged in the Complaint.

   2.      *Use of False Pretenses with Intent to Defraud – Mich. Comp. Laws § 750.218(1)(c)*

In Michigan, the crime of false pretenses is committed where a person acts with the intent to defraud or cheat by making a false pretense to, among other things, "obtain . . . money or personal property. . ."  Mich. Comp. Laws § 750.218(1)(c).  The person must have made a false representation as to an existing fact, had *knowledge* of the falsity of the representation, used the false representation with an intent to deceive, and the victim must have relied on the representation to his detriment.  *Michigan v. Bearss*, 463 Mich. 623, 627; 625 N.W.2d 10 (Mich. 2001) (citation omitted).

Taking the allegations in the Complaint as true, the Complaint initially supports an argument that the officers' conduct could be construed as the crime of false pretenses.  The Michigan Court of Appeals has previously held that false pretenses is conduct prohibited or almost entirely prohibited under a penal or criminal statute.  *Thomas v. Miller, Canfield, Paddock & Stone*, 2014 WL 5358392, at *7 (Mich. Ct. App. Oct. 21, 2014).  The Complaint alleges that the officers knowingly made false representations regarding the legality of the tariffs charged.  (Compl. ¶¶ 116-119)  Moreover, the Complaint clearly states that the board relied on these representations to the Debtor's detriment.  (Compl. ¶¶ 120-123)  Therefore, LEC-MI is arguably correct that the conduct is prohibited or is almost entirely prohibited as false pretenses.

However, the wrongful conduct rule is not applicable if the plaintiff has alternatively pled in such a way that the conduct would not be prohibited or almost entirely prohibited by a penal or criminal statute.  *See In re B & P Baird Holdings, Inc.*, 591 Fed. Appx. at 442-43 (6th Cir. 2015)

(noting that where certain issues unresolved, court could not determine whether wrongful conduct rule bars claim on motion to dismiss). Although the Complaint initially alleges that the officers acted with the requisite knowledge for the crime of false pretenses, the Trustee has alternatively pled that the officers acted with recklessness with respect to the falsity of their representations. (Compl. ¶ 119) Accepting this alternative allegation as true at this stage of the litigation, the officers' conduct does not constitute false pretenses. For the time being, the Trustee has pled around the crime.

### 3. *Racketeering – Mich. Comp. Laws § 750.159g*

In Michigan, the offense of racketeering criminalizes the commission or the aiding and abetting of the commission of an offense for financial gain involving certain specified crimes. Mich. Comp. Laws § 750.159g. Other than false pretenses, it does not appear that any of the crimes enumerated in Michigan's racketeering statute are applicable to the wrongful conduct alleged in the Complaint, and LEC-MI has not suggested otherwise. Again, because the Trustee has pled in the alternative, the wrongful conduct alleged in the Complaint does not constitute false pretenses, and by extension through Mich. Comp. Laws § 750.159g, the crime of racketeering.

### 4. *Gross Fraud or Cheat at Common Law – Mich. Comp. Laws § 750.280*

Michigan law criminalizes gross fraud or cheat at common law. Mich. Comp. Laws § 750.280. Because neither of the terms are statutorily defined, Michigan courts have applied the plain meaning according to dictionary definitions. "Gross" is defined as "flagrant and extreme." *Michigan v. Bean*, 2006 WL 3734625, at *3 (Mich. Ct. App. Dec. 19, 2006) (citation omitted). "Fraud" is defined as a "knowing misrepresentation of the truth or concealment of a material fact to induce another to act to his or her detriment." *Id*. (citation omitted). "Cheat" is defined as "to defraud; to practice deception." *Id*. (citation omitted).

15

Similar to false pretenses, the crime of gross fraud or cheat at common law requires the offender to have acted with knowledge. Again, because the Trustee has pled in the alternative by alleging recklessness, the officers' conduct does not necessarily constitute gross fraud or cheat at common law at this state of the litigation.

### 5.   Illegal Civil Conduct

Finally, LEC-MI argues that the court should extend the wrongful conduct rule to illegal civil conduct. Citing to a handful of decisions from Michigan courts, LEC-MI argues it is unnecessary to implicate a penal or criminal statute in order for the wrongful conduct rule to apply. *See Cook v. Wolverine Stockyards Co.*, 344 Mich. 207, 209; 73 N.W.2d 902 (Mich. 1955); *McDonald v. Hall*, 193 Mich. 50, 61; 159 N.W. 358 (Mich. 1916).[14] The court disagrees. *McDonald* and *Cook* were decided prior to *Orzel*, in which the Michigan Supreme Court clearly stated that the wrongful conduct rule applies only if the conduct is prohibited or almost entirely prohibited under a penal or criminal statute. *Accord Thomas*, 2014 WL 5358392, at *7 ("It must be prohibited by a penal or criminal statute."). LEC-MI offers nothing to indicate that the Michigan Supreme Court would stray from its holding in *Orzel*.

In sum, LEC-MI has not demonstrated that, on its face, the Complaint states the Debtors' conduct was prohibited or almost entirely prohibited under a penal or criminal statute. Moreover, the officers' wrongful conduct alleged in the Complaint more resembles violations of FCC rules and regulations than violations of any penal or criminal statutes. (*See* Compl. ¶¶ 49-50, 60, 66,

---

[14]      The other decisions cited by LEC-MI are inapposite. *See Boyd v. Baird (In re B & P Baird Holdings, Inc.)*, 2013 WL 6858456, at *3-4 (W.D. Mich. Dec. 30, 2013), *rev'd*, 591 Fed. Appx. at 434 (6th Cir. 2015); *Piechowiak v. Bissell*, 305 Mich. 486, 499; 9 N.W.2d 685 (Mich. 1943); *Pantely v. Garris, Garris & Garris, P.C.*, 180 Mich. App. 768, 779; 447 N.W.2d 864 (Mich. Ct. App. 1989). In *B & P Baird Holdings*, the district court affirmed the bankruptcy court's decision to construe the underlying wrongful conduct as embezzlement, not innocent conversion as the plaintiff had requested. The conduct therefore violated the criminal embezzlement statute in Michigan. However, the Sixth Circuit subsequently reversed and remanded to the bankruptcy court because the plaintiff had pled in the alternative. In *Piechowiak* and *Pantely*, the wrongful conduct was of a criminal nature.

70, 84)  LEC-MI may ultimately satisfy its burden of demonstrating that the wrongful conduct rule forecloses the Trustee from pursuing the claims for concert of action, conspiracy, unjust enrichment, and aiding and abetting the officers' breach of their fiduciary duties.  However, LEC-MI has not done so at this stage of the litigation.  The court will therefore deny LEC-MI's request to dismiss Counts VI, VII, VIII, and X based on the wrongful conduct rule.[15]

### B.        Lack of Proximate Cause

LEC-MI next contends that the Complaint fails to plausibly state claims for concert of action, conspiracy, aiding and abetting breach of fiduciary duty, and unjust enrichment because LEC-MI was not the proximate cause of the damages suffered by the Debtor.  In response, the Trustee argues that he has plausibly pled causation sufficient to survive a motion to dismiss by alleging that LEC-MI acted in concert with the Debtor's officers to charge inflated and unlawful tariffs that precipitated the Debtor's demise.

Causation is a *prima facie* element for the claims of concert of action, conspiracy, aiding and abetting breach of fiduciary duty, and unjust enrichment under Michigan law.  *See, e.g.*, *Cousineau v. Ford Motor Co.*, 140 Mich. App. 19, 33; 363 N.W.2d 721 (Mich. Ct. App. 1985) (plaintiff must prove defendant acted tortuously pursuant to common design and tortious act proximately caused injury); *Mapal, Inc. v. Abdelatif Atarsia*, 147 F.Supp.3d 670, 685-86 (E.D. Mich. 2015) (citing *Fenestra v. Gulf Am. Land Corp.*, 377 Mich. 565, 593-94, 141 N.W.2d 36 (Mich. 1966)) (conspiracy requires proof of the action causing damages); *Gold v. Deloitte & Touche LLP (In re NM Holdings Co., LLC)*, 411 B.R. 542, 551-52 (E.D. Mich. 2009) (citations omitted) (plaintiff must plead resulting harm from breach of fiduciary duty substantially assisted

---

[15]       The court need not consider at this time whether a causal nexus exists between the wrongful conduct and the Debtor's damages for purposes of the wrongful conduct rule.  The court also need not address LEC-MI's imputation arguments at this time.

by defendant); *Morris Pumps v. Centerline Piping, Inc.*, 273 Mich. App. 187, 195; 729 N.W.2d 898 (Mich. Ct. App. 2006) (citation omitted) (plaintiff must allege receipt of benefit by defendant from plaintiff to state claim for unjust enrichment).

Whether the Trustee can prove causation is an issue for another day.  At this stage, the court need only consider whether it has been plausibly pled.  *See Handy-Clay v. City of Memphis*, 695 F.3d 531, 538 (6th Cir. 2012) (court need not weigh evidence as part of motion to dismiss under Rule 12(b)(6)); *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 618-20 (6th Cir. 2004) (issues of causation are fact-driven and better suited for determination on summary judgment).  Here, the Trustee has alleged sufficient facts for the court to infer that LEC-MI played a role in the Debtor's financial collapse.  In the Complaint, the Trustee alleges that the Debtor's improperly inflated 1-800 call traffic could not have been delivered onto the Debtor's network without LEC-MI's involvement.   (Compl. ¶¶ 35-39)   The Complaint further alleges that the revenue sharing agreement entered into by LEC-MI and the Debtor provided LEC-MI with an incentive to engage in the unlawful tariff scheme and provided it with benefits in the form of kickbacks.  (Compl. ¶¶ 39-40, 153, 156)  Moreover, according to the Complaint, LEC-MI was aware of the illegality of the tariffs charged, as well as the circuitous nature of the call routing.  (Compl. ¶¶ 56-59, 62-65)

The Complaint further states that because of LEC-MI's unlawful concerted action or conspiracy with the officers to deceive the FCC, the Debtor suffered a "predictable and precipitous financial collapse."   (Compl. ¶¶ 157-158, 164)   The Complaint states that LEC-MI "directly benefited" from the officers' breaches of fiduciary duty by "reaping financial rewards" to which it was not otherwise entitled by virtue of the revenue sharing agreement.  (Compl. ¶ 169)  Finally,

18

the Complaint alleges that the Debtor was forced to repay and cancel outstanding obligations as a result of the kickbacks retained by LEC-MI.  (Compl. ¶¶ 180-184)

Contrary to LEC-MI's suggestion, the Complaint does not solely allege that the Debtor's financial collapse was due to the Debtor having to reduce its own fraudulent tariffs.  (Compl. ¶¶ 92-93)  As noted above, the Complaint states that the Debtor was damaged by LEC-MI's alleged retention of kickbacks under the revenue sharing agreement, as well as by the monetary damages and injunctive relief awarded to AT&T by the FCC.  (Compl. ¶¶ 94, 164, 169, 181)  LEC-MI is alleged to be complicit in such conduct.  (Compl. ¶¶ 156, 157, 163, 167-168, 179-181)  Although the FCC may not have found that LEC-MI charged unlawful rates in its order, the Complaint alleges that LEC-MI had knowledge of the Debtor's illegal tariffs and continued to participate in the scheme.[16]  (Compl. ¶¶ 57-59, 62-65)  All of these allegations support the element of causation.

The Trustee has alleged sufficient facts to plausibly plead that LEC-MI was a cause of the Debtor's demise.  The court will therefore deny LEC-MI's request to dismiss Counts VI, VII, VIII and X for lack of proximate cause.

## C.      *Statute of Limitations*

LEC-MI next argues that the Trustee's claims for concert of action, conspiracy, aiding and abetting a breach of fiduciary duty, and unjust enrichment are time barred.  LEC-MI notes that the Complaint alleges that the officers' fraudulent scheme began in 2010.  LEC-MI further observes that in Michigan the statute of limitations for aiding and abetting a breach of fiduciary duty is three years and the statute of limitations for the remaining claims is six years.  Because the schemes not

---

[16]      LEC-MI also argues that the Trustee is estopped due to the FCC order.  LEC-MI has not identified a particular type of estoppel or further explained in detail how estoppel might apply.  It is also unclear whether estoppel would apply given the reversal of a portion of the FCC order on appeal.  *Great Lakes Comnet, Inc. v. FCC*, 823 F.3d 998 (D.C. Cir. 2016).  Regardless, the Complaint at this stage has sufficiently alleged that the schemes in which LEC-MI participated caused damage to the Debtor.

19

only began in 2010, but also began causing injury at that time, LEC-MI argues the claims should be dismissed as untimely.

In response, the Trustee notes that section 108(a)(2) tolls the statutes of limitations for his state law claims by two years so long as the statutes did not run prior to the petition date. Thus, the Trustee posits that all of his claims subject to a six-year statute of limitations are timely if they accrued on or after January 25, 2010. The Trustee also argues that his unjust enrichment claim is timely because the kickbacks allegedly paid to LEC-MI began on January 24, 2012, rendering his claim well within the six-year statute of limitations. Finally, the Trustee notes that even though the statute of limitations for aiding and abetting is only three years, he nonetheless has complied due to an allegedly applicable discovery rule under Michigan law and tolling under section 108.

LEC-MI does not mention section 108 in its analyses of the timeliness of the Trustee's claims. Section 108, however, is paramount to the statute of limitations arguments raised by LEC-MI. Section 108 provides in pertinent part that if "applicable nonbankruptcy law… fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition," the debtor may commence such an action within two years after the order for relief. 11 U.S.C. § 108(a)(2). The Debtor's voluntary petition was filed on January 25, 2016. Section 108(a)(2) renders any claim as to which the statute of limitations had not expired on the petition date timely if it was filed on or before January 25, 2018. The Complaint in this adversary proceeding was filed well before that date. For the reasons discussed below, the court concludes that none of the Trustee's state law claims are time barred.

*1.      Concert of Action and Conspiracy*

With respect to the claims for concert of action and conspiracy, a six-year statute of limitations for the underlying tort – fraud – controls. *See McCormick v. Hanover Grp., Inc.*, 2012

20

WL 1697157, at *5 (Mich. Ct. App. May 15, 2012) (citations omitted) (six-year statute of limitations for underlying tort of fraud applies to conspiracy claim); *see also Cousineau*, 140 Mich. App. at 37 (concert of action and conspiracy are claims which do not exist independently of underlying tortious act).

Under Michigan law, a claim accrues "at the time the wrong upon which the claim is based was done regardless of the time when damages result." Mich. Comp. Laws § 600.5827. The statute of limitations runs from the time the claim accrues. *Id.* The Michigan Supreme Court has interpreted this language to mean that the "wrong" occurs, and thus the claim accrues, when the defendant's act harms the plaintiff, not when the defendant's conduct occurs. *Boyle v. Gen. Motors Corp.*, 468 Mich. 226, 231-32 & n.5; 661 N.W.2d 557 (Mich. 2003) (fraud claim) (citing *Stephens v. Dixon*, 449 Mich. 531, 534-35; 536 N.W.2d 755 (Mich. 1995) (negligence claim)).[17]

LEC-MI mistakenly asserts that the relevant time is when the alleged fraudulent scheme began. The relevant time is when the Debtor was financially harmed by the fraudulent schemes, which the Complaint alleges occurred in 2015. (Compl. ¶¶ 158-59, 164-65, 170-71, 176-77) As such, the concert of action and conspiracy claims accrued within the six-year limitations period.[18]

2.      *Unjust Enrichment*

The Trustee's unjust enrichment claim is also subject to a six-year statute of limitations. *Mercy Servs. for the Aging v. City of Rochester Hills*, 2010 WL 4137465, at *3 (Mich. Ct. App.

---

[17]     Two of the cases cited by LEC-MI in support of the proposition that the Trustee's claims accrued at the inception of the unlawful schemes are inapposite. *See, e.g.*, *Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 598 (6th Cir. 2014) (continuing violation doctrine pursuant to federal antitrust law); *Vandenheede v. Vecchio*, 2013 WL 692876, at *3 (E.D. Mich. Feb. 26, 2013) (considering limitations period in Mich. Comp. Laws § 600.5805 applicable to actions for injury to person or property and relying upon Michigan case discussing application of continuing violation theory to civil rights claims).

[18]     Moreover, even if the court were to accept LEC-MI's contention that these claims accrued when the schemes allegedly began in 2010, the court could still conclude at the motion to dismiss stage that the claims accrued on or after January 25, 2010. *See* 11 U.S.C. § 108(a)(2).

Oct. 21, 2010) (citing Mich. Comp. Laws §§ 600.5813, 600.5815).   The claim for unjust enrichment accrued when the Debtor began paying kickbacks to LEC-MI pursuant to the revenue sharing agreement on January 24, 2012.  (Compl. ¶ 40)  By tolling the statute of limitations by two years pursuant to section 108(a), the Trustee's claim is timely if it accrued on or after January 25, 2010.

LEC-MI asserts that the unjust enrichment claim accrued in 2010 because the Complaint states the Debtor conferred a benefit on LEC-MI and other parties "from or around 2010 until or around 2015."  (Compl. ¶ 179)  However, the Complaint contains more specific allegations at paragraph 40 regarding the receipt of kickbacks which occurred between January 24, 2012 and May 18, 2016.  These allegations are more than sufficient given the "quasi-contractual" nature of an unjust enrichment claim.  *Currithers v. FedEx Ground Package Sys., Inc.*, 2012 WL 458466, at *6 (E.D. Mich. Feb. 13, 2012) (alleged unjust enrichment began when plaintiffs began providing services under contract).

Even if the Complaint alleged only that LEC-MI first received payments in 2010, the Trustee's claim would still not be time barred for at least two reasons.  First, as noted by the Trustee, section 108(a) renders claims accruing on or after January 25, 2010 timely.  The allegation highlighted by LEC-MI does not contain a date, and it is certainly possible that LEC-MI's retention of payments pursuant to the scheme began after that date.

Second, LEC-MI argues that an unjust enrichment claim accrues upon the retention of the first payment and any later benefits accrued are not distinct injuries.  However, the decisions cited by LEC-MI are not consistent with Michigan law, which permits recovery of any unjust enrichment occurring during the limitations period.  *See, e.g.*, *Mercy Servs.*, 2010 WL 4137465, at *3 (recovery of payments occurring during limitations period permitted despite payments

22

beginning in late 1980s); *Romeo Inv. Ltd. v. Mich. Consol. Gas Co.*, 2007 WL 1264008, at *8 (Mich. Ct. App. May 1, 2007) (diminished claim for unjust enrichment for any enrichment occurring during limitations period would have been available despite payments beginning in 1976). The court therefore concludes that the Trustee's unjust enrichment claim is timely.

### 3.      *Aiding and Abetting Breach of Fiduciary Duty*

The parties appear to agree that the Trustee's claim for aiding and abetting breach of fiduciary duty is subject to a general limitations period of three years, but disagree with respect to the applicable statute. *See* Mich. Comp. Laws § 600.5805(10) (actions to recover damages for injury to person or property); Mich. Comp. Laws § 450.1541a(4) (actions against officers or directors for failure to perform fiduciary duties). LEC-MI relies on *In re NM Holdings Co., LLC*, 411 B.R. at 551-52, where the court held that a claim for aiding and abetting a breach of fiduciary duty is subject to the generally applicable common law tort statute of limitations of three years.[19] The Trustee asserts that aiding and abetting a breach of fiduciary duty is akin to joint and several liability for the underlying breach. As such, the Trustee argues the claim should be governed by Mich. Comp. Laws § 450.1541a(4), which provides a two-year period beginning when the cause of action for breach of fiduciary duty could have been discovered. Because the Debtor's bankruptcy tolled the statute of limitations by two years pursuant to section 108(a) and the claim could not have been discovered prior to April 2014, the Trustee posits that the claim was timely.

Where a claim does not have a directly applicable statute of limitations, Michigan courts consider the "gravamen" of the suit to determine the most closely applicable statute of limitations to the claims alleged. *See Stephens v. Worden Ins. Agency, LLC*, 307 Mich. App. 220, 228-29; 859 N.W.2d 723 (Mich. Ct. App. 2014) (citations omitted). Decisions from Michigan courts

---

[19]      The parties in *NM Holdings* did not raise the limitations period in Mich. Comp. Laws § 450.1541a(4). *See Gold v. Deloitte & Touche LLP (In re NM Holdings Co., LLC)*, 405 B.R. 830, 845-46 (Bankr. E.D. Mich. 2008).

provide some support for the parties' respective positions.  *Compare Madden v. Avila*, 2016 WL 6138617, at *2-3 (Mich. Ct. App. Oct. 20, 2016) (breach of fiduciary duty claim subject to limitations period in Mich. Comp. Laws § 450.1541a(4), not general statute of limitations in Mich. Comp. Laws § 600.5805(10)) *with Carto v. Underwood Prop. Mgmt. Co.*, 2008 WL 2389493, at *3 (Mich. Ct. App. June 12, 2008) (applying limitations period in Mich. Comp. Laws § 600.5805(10) to breach of fiduciary duty claim because it sounds in tort).

However, the statute of limitations under Mich. Comp. Laws § 450.1541a(4) applies to an "action against a director or officer" for failure to perform his or her fiduciary duties.  Because the aiding and abetting claim is not asserted against the Debtor's officers or directors, the court concludes that the more appropriate statute of limitations for the claim against LEC-MI is the three-year period in Mich. Comp. Laws § 600.5805(10).[20]  *See In re NM Holdings Co., LLC*, 411 B.R. at 551-52.

Contrary to LEC-MI's argument, a three-year limitations period does not require dismissal of the aiding and abetting claim.  Under Michigan law, a breach of fiduciary duty claim does not accrue until the plaintiff becomes aware of an injury and its possible cause.  *See Pedinelli v. Turnberry Park Estates Inc.*, 2016 WL 370043, at *8 (Mich. Ct. App. Jan. 28, 2016) (citations omitted).  Therefore, LEC-MI's alleged aiding and abetting of the Debtor's officers could not have occurred until the Debtor's board discovered the underlying breaches of fiduciary duty.  The Complaint unambiguously states that the Debtor's board could not have discovered the breach of fiduciary duty until April 2014 (*i.e.*, the date of accrual) at the earliest.  (Compl. ¶ 79)  When the two-year tolling period under section 108(a) is included, the Trustee's claim for aiding and abetting

---

[20]     Ultimately, the selection of the general tort limitations period over the limitations period in Mich. Comp. Laws 450.1541a(4) is of little consequence in light of Michigan law regarding the time of accrual of a breach of fiduciary duty claim and the tolling period under section 108(a).  Even if the court applied Mich. Comp. Laws 450.1541a(4) limitations period with its applicable discovery rule as the Trustee argues, the result would be the same.

breach of fiduciary duty is timely.  In sum, the court will deny LEC-MI's request to dismiss Counts

VI, VII, VIII and X for untimeliness.

### D.      Unjust Enrichment

LEC-MI next argues that the Complaint fails to state a claim for unjust enrichment.  The

Sixth Circuit has succinctly explained unjust enrichment under Michigan law as follows:

> The courts of Michigan will imply a contract when a plaintiff can establish
> that no express contract concerning the subject matter exists and that the
> defendant has received a benefit from the plaintiff and retained it, resulting
> in an inequity.  *Fodale v. Waste Mgmt. of Mich., Inc*., 271 Mich. App. 11;
> 718 N.W.2d 827, 841 (Mich. 2006).  *Peabody v. DiMeglio*, 306 Mich. App.
> 397; 856 N.W.2d 245, 251 (Mich. Ct. App. 2014) ("'[T]he law operates to
> imply a contract in order to prevent unjust enrichment,' and . . . this will not
> occur if there is already an express contract on the same subject matter.")
> (internal citation omitted).

*Solo*, 819 F.3d at 796.

LEC-MI directs the court to paragraph 179 of the Complaint, which expressly states that

all of the benefits the Debtor derived from the kickbacks were related to the revenue sharing

agreement.[21]   According to LEC-MI, because an express contract covers the kickbacks, the

Trustee's claim for unjust enrichment must fail.

In his Response, the Trustee notes that claims may generally be pled in the alternative,

including claims for unjust enrichment under Michigan law.  *See* Fed. R. Bankr. P. 7008

(incorporating Fed. R. Civ. P. 8(d)); *Gold v. Winget (In re NM Holdings Co., LLC)*, 407 B.R. 232,

287-88 (Bankr. E.D. Mich. 2009) (citations omitted).  By stating an alternative claim for unjust

---

[21]      LEC-MI also argues that the Trustee is precluded from pursuing any claim for unjust enrichment because the
Debtor stipulated in another proceeding that an express contract controlled the same subject matter.  Accordingly,
LEC-MI argues that the Trustee is estopped, as he stands in the shoes of the Debtor.  The court is unable to fully
consider this argument, as LEC-MI has not identified any specific doctrine of estoppel that might apply, nor has LEC-
MI explained such argument in any detail.

enrichment, the Trustee argues that his Complaint is consistent with this general rule and therefore immune from dismissal under Rule 12(b)(6).

The court agrees with the Trustee's recitation of alternative pleading standards. However, the Complaint must nonetheless set forth the *prima facie* elements of a claim, even when such claim is pled in the alternative. *Solo*, 819 F.3d at 796; *see In re B & P Baird Holdings, Inc*., 591 Fed. Appx. 442. In order to state a claim for unjust enrichment, the Trustee must plead that some benefit was derived separate and apart from the revenue sharing agreement. Here, the Complaint alleges in Count X that any and all kickbacks were "associated with their revenue sharing agreements with [the Debtor]." (Compl. ¶ 179) The Complaint does not state or even leave open the possibility that some of the kickbacks may have been paid outside the context of the revenue sharing agreement.

While it may be true that some of the kickbacks were not subject to the revenue sharing agreement as the Trustee suggests in his Response, the Complaint definitively states that the kickbacks were derived from the revenue sharing agreement. In light of this technical flaw, the court will grant LEC-MI's request to dismiss Count X for failure to state a claim for unjust enrichment.

### E. Fraudulent Transfer Claims

LEC-MI next argues that the Trustee's claims for the avoidance of actual and constructive fraudulent transfers were not pled with particularity pursuant to Rule 9(b). According to LEC-MI, the Trustee must include specific details in the Complaint regarding each transfer subject to avoidance under sections 544(b) and 548, regardless of whether the particular transfer is actual or constructive. LEC-MI also argues that the claims should be dismissed because the Trustee has

26

improperly pled actual and constructive fraudulent transfers in the same counts of the Complaint. (*See* Compl. ¶¶ 186-207)

The Trustee responds by asserting that Rule 9(b) is not applicable to constructively fraudulent transfers.  The Trustee also attempts to cure any deficiency by attaching to his Response a spreadsheet of transfers that includes details identifying the transferor, the transferee and the date and amount of each transfer.

Rule 9(b), which is incorporated by Bankruptcy Rule 7009, requires a party pleading fraud to "state with particularity the circumstances constituting fraud. . ."  Fed. R. Civ. P. 9(b).  The Sixth Circuit has explained that Rule 9(b) requires a plaintiff to allege the time, place and content of the alleged misrepresentations on which he or she relies, the alleged fraudulent scheme, the fraudulent intent of the defendants, and the injury resulting from the fraud.  *Sanderson v. HCA-The Healthcare Co*., 447 F.3d 873, 877 (6th Cir. 2006) (citation omitted).  In other words, the plaintiff must specify the "who, what, when, where, and how" of the alleged fraud.  *Id*. (citation omitted).

Rule 9(b) is designed to put a defendant on notice of alleged misconduct as well as to prevent fishing expeditions and narrow discovery to relevant matters.  *See Republic Bank & Trust Co. v. Bear Stearns & Co., Inc*., 683 F.3d 239, 255 (6th Cir. 2012) (citation omitted).  The fraudulent intent of the debtor need not be pled with particularity.  *In re NM Holdings Co., LLC*, 407 B.R. at 262.  Rather, the plaintiff only needs to plead the "circumstances constituting fraud" in order to satisfy Rule 9(b)'s heightened pleading standard.  *Id*.

### 1.    Actual Fraudulent Transfers

The majority of courts have concluded that Rule 9(b) is applicable to claims for actual fraudulent transfers under sections 544(b) and 548.  *See, e.g*., *Spradlin v. Pryor Cashman LLP (In*

*re Licking River Mining, LLC)*, 565 B.R. 794, 807 (Bankr. E.D. Ky. 2017); *Wagner v. Cunningham (In re The Vaughan Co., Realtors)*, 481 B.R. 752, 757-58 (Bankr. D.N.M. 2012); *but see also Leslie v. Bartamian (In re Mihranian)*, 2017 WL 2775043, at *7 (B.A.P. 9th Cir. June 29, 2017) (actual fraudulent transfer claim based on intent to hinder or delay need not be pled with particularity).

This court finds the majority approach to be persuasive and well-reasoned.  The Complaint must provide specific information with respect to each transfer, including the date and amount of the transfer, the identity of the transferor and initial transferee, and the consideration paid, if any. *In re NM Holdings Co., LLC*, 407 B.R. at 261 (citations omitted).  The Complaint's allegation that "the Debtors" made an aggregate amount or series of transfers over a period of time to unidentified transferees, without further detail, is insufficient to satisfy the heightened pleading standard applicable to claims for actual fraudulent transfers.  (Compl. ¶ 37)  The court shall therefore grant LEC-MI's request to dismiss the claims in Counts XI and XII for the avoidance of actual fraudulent transfers under section 544(b) and 548.

2.      *Constructive Fraudulent Transfers*

While actual fraudulent transfer claims must be pled with particularity, the same cannot be said for constructive fraudulent transfer claims.  The majority of courts have concluded that constructive fraudulent transfer claims need only be plausibly pled.  *See, e.g.*, *In re The Vaughan Co., Realtors*, 481 B.R. at 763; *Pereira v. Grecogas Ltd. (In re Saba Enter., Inc.)*, 421 B.R. 626, 645-46 (Bankr. S.D.N.Y. 2009); *but see OHC Liquidation Trust v. Nucor Corp. (In re Oakwood Homes Corp.)*, 325 B.R. 696, 698 (Bankr. D. Del. 2005).

This court again agrees with the well reasoned approach of the majority.  Constructive fraudulent transfer claims, despite nominally involving "fraudulent transfers," do not actually

28

require proof of fraud or wrongdoing on the part of the defendant. *The Air Cargo, Inc. Litig. Trust v. i2 Tech., Inc. (In re Air Cargo, Inc.)*, 401 B.R. 178, 192 (Bankr. D. Md. 2008); *Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Tech. Ltd.)*, 337 B.R. 791, 801-802 (Bankr. S.D.N.Y. 2005). Instead, they are based on the debtor's financial condition, the value given for the transaction, and the terms and conditions of the transfer. *See Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 53-54 (2d Cir. 2005). As such, they need not be pled with particularity under Rule 9(b).

Nonetheless, a plaintiff must still plead facts with sufficient information to put a defendant on notice of the claim. *In re Licking River Mining, LLC*, 565 B.R. at 808. A complaint alleging constructively fraudulent transfers should contain, at the very least, facts to support the following three elements of the claim – a transfer within the requisite time period, lack of reasonably equivalent value, and the debtor's insolvency during that period. *See id*. at 814.

Here, the Complaint satisfies Rule 8, *Twombly*, and *Iqbal* by plausibly stating claims under sections 544(b) and 548 for the avoidance of constructively fraudulent transfers. Counts XI and XII set forth the elements of a cause of action for constructive fraudulent transfers under section 544(b) (incorporating Mich. Comp. Laws § 566.35) and section 548. (Compl. ¶¶ 189-195, 200-206) The Complaint also sets forth sufficient facts in support of those elements. Specifically, paragraph 37 alleges transfers between the Debtors, LEC-MI and other defendants totaling $8 million between 2010 and 2016. Similarly, paragraph 40 alleges that the Debtors made transfers in the amount of approximately $2.4 million between January 23, 2012 and May 18, 2016.

In addition, the Complaint includes allegations that the Debtors did not receive reasonably equivalent value for the transfers. (Compl. ¶¶ 190, 201) The Complaint further states that LEC-MI was paid "generous kickbacks" by the Debtors in exchange for routing 1-800 calls to the

29

Debtor's fiber network.  (Compl. ¶ 39)  The Complaint alleges that the Debtors were insolvent or became insolvent shortly after some or all of the transfers were made or as a result of the transfers.  (Compl. ¶¶ 195, 206)  The Trustee has therefore plausibly stated claims under sections 544(b) and 548 for the avoidance of constructive fraudulent transfers in Counts XI and XII.

### 3. Pleading Multiple Claims in One Count

Finally, LEC-MI argues that the claims for actual and constructive fraudulent transfers must be pled in separate counts.  The court disagrees.  Rule 10, incorporated by Bankruptcy Rule 7010, provides in pertinent part that each claim based on a "separate transaction or occurrence" must be stated in a separate count "if doing so would promote clarity."  Fed. R. Civ. P. 10(b); *see also* Fed. R. Bankr. P. 7008 (incorporating Fed. R. Civ. P. 8(e) (pleadings must be construed to promote justice)).  Even though they are in the same count, the two claims are easily discernable.  There is no need for the additional clarity contemplated by Rule 10.[22]  Moreover, the Trustee has properly pled claims arising under section 544(b) and 548 in separate counts.  This is enough.

### F. Leave to Amend Complaint

When a motion to dismiss is granted, courts typically grant leave to amend the complaint.  *Brown v. Matauszak*, 415 Fed. Appx. 608, 615 (6th Cir. 2011) (citation omitted).  Generally, if it is "at all possible" that the losing party can state a claim for relief in a more carefully drafted complaint, the court should provide at least one opportunity to amend.  *Brown*, 415 Fed. Appx. at 614 (citation omitted); *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 644 (6th Cir. 2003) (citations omitted).

Here, it is entirely possible that the Trustee can amend his complaint to plausibly state claims for relief for unjust enrichment and the avoidance of actual fraudulent transfers.  Indeed,

---

[22] This may largely be a moot point.  The court has granted LEC-MI's request to dismiss the claims for actual fraudulent transfers due to a lack of particularity.

the Response likely contains the very information regarding the alleged transfers that the Motion faulted the Complaint for not including. Likewise, the unjust enrichment claims are not so far from being plausibly stated that an amendment would be futile. The court shall therefore provide the Trustee with leave to amend the complaint.

## CONCLUSION

For the foregoing reasons, the court shall grant the Motion as it pertains to the Trustee's claims for unjust enrichment, aiding and abetting breach of fiduciary duty by the Debtor's directors and the avoidance of actual fraudulent transfers under sections 544(b) and 548. The remainder of the Motion shall be denied. The court shall enter a separate order consistent with this Opinion.

**Signed: June 15, 2018**





John T. Gregg
United States Bankruptcy Judge